Ranney, J.'
I concur with my brethren that the injunction granted in this case should be dissolved, and the bill dismissed, but being unable to agree with them in their construction of one of the most important provisions of the constitution of the state, I proceed at once, and without apology, to state the grounds upon which my conclusions are based. The complainant is a branch of the State Bank, and claims that it is taxed, in common with the other banks of the state, by the tax law of April 13, 1852, much more than is authorized by section 60 of the act of 1845, under which it is organized, or by the present constitution of the state. So far as protection is sought under the act of 1845, its claims were fully considered at the last term of this court in several cases then heard, in which it *52 was hold that section CO of that act interposed no obstacle to the taxation of the banks formed under it, in common with other property, in such manner and to such extent as the general assembly should see fit to provide; that the general assembly of 1845 had not by that act attempted to surrender or abridge this power in subsequent legislatures; and that it would not have beep binding if it had been attempted.
52] *It only remains now to consider whether the tax law of 1852 under which this tax is levied, is consistent with the constitution of this state which took effect September 1,1851. It is claimed to bo unconstitutional, and the tax illegal, because, by section 10, individuals and corporations other than those exercising banking privileges, are allowed “to deduct from the gross amount of their moneys and credits, the amount of all bona fide debts owing by such person, company, or corporation, for a consideration received.” From which it is claimed, and I think is manifest, although not sufficiently shown in the bill, that the tax upon this institution is larger than it would have been if no such deductions had been allowed.
My brethren assent to the position that this section of the law is in conflict with the constitution, but nevertheless hold that it may be stricken out and separated from the balance of the enactment without prejudice to the other provisions of the law, which are in themselves perfect and complete; and inasmuch as the complainant is regularly taxed in accordance with those provisions, the tax is legal and may be enforced. Proceeding upon these grounds, I might be brought to the same conclusion; but I cannot agree that this section, in so far as it allows debts owing by individuals to be deducted from moneys due to them, and taxes only the balance, is in conflict with any provision of the constitution. To authorize us to declare that such conflict exists, the case must, as we have already held, bo clear, plain, and palpable. “The presumption is always in favor of the validity of the law; and it is only when manifest assumption of authority and clear incompatibility between the constitution and the law appear, that the judicial power can refuse to execute it. Such interference can never be permitted in a doubtful caso.” C., W. & Z. R. R. v. The Commissioners of Clinton County, 1 Ohio St. 82.
Is it, then, plain, obvious, manifest, that the convention that framed, and the people who adopted the constitution, intended by section *53, 54 2 of article 12 to prohibit the general assembly fr-om allowing individuals to deduct *their liabilities from the gross amount of [53 debts due them? or, by section 3 of the same article, intended to extend to banks the same right of deduction as might be allowed to individuals? I hold the negative of both questions, and hope to be able to show that section 3 was inserted for the very purpose of declaring and enforcing this difference, without which it would have been entirely useless and improper; and that instead of working inequality in the burdens of taxation, as between banks and individuals, the contrary construction results in the very inequality against which this section was intended to provide.
The great object of all construction is to arrive at the intention and purpose of the law-maker. This is never to be lost sight of, and will always control the strict letter of the law, when, by adhering to that, its great leading purpose would be defeated. It must be so construed, ut res magis valeat; and to do so, a consideration of its spirit and policy, the mischief felt and the remedy provided, becomes indispensably necessary. This is due to any enactment; and in an eminent degree to the constitution of a republican state.
It must not be dissected, and its parts construed separately, but the intention of the lawgiver is to be deduced from a view of the whole, and of every part taken and compared together. He must be presumed to have intended to be consistent with himself throughout, and at the same time to have intended effect to be given to each and every part of the enactment. It results from this, that general language found in one part is to be modified and restricted in its application, when it would otherwise conflict with specific provisions found in another; and this from the reasonable and almost irresistible conclusion that when the mind is drawn to particulars, the language used is more likely to express the intention than general words which might otherwise cover it, but from which it does not appear that the particular case was in the mind of the legislator when he used them.
In the light of these long-established guides to direct our course to the great end of all construction, let me first inquire, *what [54 are the great leading objects of article 12, in connection with other provisions relating to the same object, apparent upon its face?
I answer: 1. To compel the legislature, by laws stating distinctly the object, to provide for raising by taxation, each year, an amount of revenue sufficient to defray the expenses of the state, pay the *55 interest on the state debt, and by section 7, article 8, not less than one hundred thousand dollars for the sinking fund.
2. To prohibit the laying any pai't of this sum upon persons by the poll; from which, with deference to others who have thought differently, I am unable to distinguish imposition upon professions and occupations.
3. To designate the basis of taxation to be property — property alone — and all the property of the state,¡with some few specified exemptions, to be allowed at the discretion of the general assembly.
4. To require the same burden to be laid upon the same value, whether it consists of lands, goods, money, or choses in action, or in whatever way it may be used or employed. This is taxing all values “by a uniform rule; ” and if I understand rightly this provision of our constitution, it was designed for the same purpose, and effects the same object, as between persons and places, as that provision of the federal constitution which requires “ all duties, imposts, and excises to be uniform throughout the United States; ” although it goes further, and enforces the same uniformity as to every species of property. Whatever goes upon the duplicate, let it be lands, goods,- moneys, credits, or investments in bonds or stocks, goes there at its true value; and must, under all circumstances, be subjected to the same rate per cent, of taxation.
But the question still is, what is each individual bound to place there as the basis upon which this levy is to be made? The pomplainant’s counsel answer: All his real and personal property in possession, at its true value in money, and the gross amount of all 55] his choses in action, of whatever name, ^without any regard to the debts he may owe. Their argument amounts to this : Section 4 of article 13 provides: “The property of corporations now existing, or hereafter created, shall forever be subject to taxation, the same as the property of individuals.” Banks are corporations; and by section 3 of article 12 they are required to be taxed upon the gross amount of all their choses in action, and other property without deduction; and at the same time are only to “ bear a burden of taxation equal to that imposed upon the property of individuals.” ' If individuals are allowed to deduct, it necessarily throws a greater burden upon the banks, and their property is not then taxed “ the same as the property of individuals.” Besides, by section 2 of article 12, “ all moneys, credits, investments in bonds, *56 stocks, joint stock companies, Or otherwise,” are expressly required to be taxed; while no deduction for debts owing is provided for.”
An argument thus ingenious and plausible at least, and which my brethren think sound, deserved and has received my utmost attention; but I can not avoid believing it makes the constitution speak language it was never designed to speak, and results in consequences at variance with its spirit and policy.
A moment’s consideration will show that the argument can derive no strength from the section quoted from the article on corporations. Banks, it is true, are corporations, but their taxation is specially provided for by section 3, of article 12, which must, as we have seen, limit and control the general language in the former section, if any difference is found to exist between them.
If no such difference is found, it can, of course, add nothing to the force of the latter. It is, however, plain to me, that the section was merely intended to assert the general principle, that the property of corporations “now existing or hereafter created,” should, like the property of individuals, forever be subject to taxation, without attempting to prescribe the particular manner in which this should be done, but leaving *that entirely to the appropriate [56 article upon finance and taxation. Yiewed in that light, and with reference to previous legislation, it was not only proper, but very important. The general assembly, for many years, had been in the habit of inserting in acts for the incorporation of turnpike, plank-road, canal, and probably railroad companies, provisions exempting them from taxation. For the purpose not only of prohibiting this in the future, but of subjecting all such existing companies to taxation, this section was inserted. It has, therefore, an obvious and extensivo subject-matter for its operation and effect, without pressing it to the unreasonable length of controlling, or in any way affecting, the specific provisions of the article upon finance and taxation. .This brings me to that article, and I proceed first to consider its second section.
It provides: “ Laws shall be passed, taxing by a uniform rule, all moneys, credits, investments in bonds, stocks, joint stock companies, or otherwise; and also, all real and personal property, according to its true value in money.” The section then proceeds to allow the general assembly to exempt from taxation certain specified property devoted to public, literary, religious, and charitable purposes; and *57 also, personal property not exceeding in value $200 to each individual.
1 say nothing of the right to deduct from moneys, or from investments in bonds and stocks, for the double reason that these may bo, and for most purposes are, regarded and treated as property in possession, having intrinsic value, and not the mere evidence of claims upon others, and because no deduction is allowed from these “investments” by the section of the law under consideration. Credits are, by the -constitution, to be taxed, and from the gross amount, each individual is, by this section, entitled to deduct his bona fide debts, and return the balance. The language of the law may not be strictly accurate. The evident meaning, however, is, that debts may be deducted from the gross amount of notes, 57] accounts, and other choses in action, belonging *to the individual. If the balance thus ascertained, is not the precise amount and value of the credits of the party against the world, both in legal and popular sense, I confess myself unable to understand the meaning of words or force of language.
This section does not say the gross amount of all notes, accounts, and other choses in action shall bo taxed; and it can not be so construed, in my opinion, without perverting both its language and obvious meaning, and making it work an injustice never contemplated by those who framed and adopted it. Consider for a moment its practical operation under such a construction. A has a note of $1,000 upon an insolvent man, from whom no part of it can be collected. Is he to be taxed every year upon the nominal amount due from this insolvent creditor ? I presume this would not be contended; and yet, if he is not, it is only because the note, as such, is not taxed, but only the sum of money which the holder is entitled, and may expect to receive upon it. If the constitution was silent, the power of ascertaining its true value, and taxing only that, would bo necessarily implied. But it is not silent; it imperatively requires it, in language too plain to be misunderstood, and which ought not to be confined in its application to the phrase “real and personal property,” but should be construed distributively, and applied to each enumeration preceding those words.
A has an account against B for a thousand dollars, and B a like amount against A. Neither owes or could recover against the other anything, and yet $2,000 must be put upon the tax duplicate. Or if it should be thought to make any difference, suppose the same *58 state of .indebtedness to exist, evidenced by promissory notes. Each is a chose in action held by the party to whom it belongs, and under a construction which sticks in the letter, must be returned to the assessor; and yet it is clear that neither, as against the other, has on'e cent of credit, either in amount or value. These evidences of indebtedness have no intrinsic value, and are only worth something because the estate of the owner is to be increased ^by receiving something upon them. Where in the aggregate [58 he is entitled to receive nothing, if he is taxed, he is taxed upon pure fiction. The tax duplicate may be in this way increased, but not from the’ property in the state.
What, then, does the constitution require to be taxed? Plainly property, wealth, substantial values, and nothing else. The pecuniary burdens of the state are made a charge upon the property of the state. They attach to it as an incident; issue out of it; and the holder is only charged by reason of his ownership of it. This property may be in possession of the owner, or it may be in action —in the hands of others for his use and benefit. He should and is" required to be taxed upon the whole amount of his property in possession, and such further sum as he is entitled, and able to add to it as against the world, from his rights in action, This is the measure, extent, and value of his credits. He is thus taxed upon everything he owns, and if taxed more, he is made to pay more than his share of the public burdens. This, it is true, may be more than he is worth after paying his debts; and it might be more equitable, if practicable, to make him pay only on what he is worth. But this has never been, and is not now the basis of our system. Owning property upon which the tax is a lien, he stands charged by reason of his ownership, and the state does not look beyond the property itself, for the charge upon it. Whoever may be the owner, and however much it may be encumbered with debts, it is still property having intrinsic value, protected by the laws, and rightfully charged with its proportion of the. necessary expense arising therefrom. The debts of the owner may be due to persons out of the state, and beyond the reach of our laws. If in such case, the debts of the owner could be received, to discharge the property of this just and equitable burden, a large amount of property within the state would entirely escape taxation. If due to persons within the state, and the credit is taxed, still no injustice is done to the owner of the property, for the government protects it in his.hands as long *59, 60 59] as he chooses to keep it; and certainly, *none to the creditors, for they are not taxed beyond the wealth they possess, or the amount they are entitled and expected to receive. The owner can not be relieved, and the burden upon his property transferred to his creditors in the way of a tax upon the credit; because it is entirely impracticable if the creditor is within the state, and impossible. if without it. The creditor can not be relieved without gross injustice as between him and other tax-payers.
But is it not a little remarkable, considering the construction now put upon the constitution, that, while this system of assessing and taxing credits had constituted a part of our revenue system for many years, not one word of discontent was uttered in the convention or elsewhere, to my knowledge, against it; and at the same time a most vigorous attempt was made to extend the principle to ■deductions from tangible property. But it is said we are bound to ■shut our eyes to all such considerations. I do not think so; but I .admit they are not to be used to control the plain and obvious language of the instrument. In what sense was the word credit used? ■is the question. It is claimed to be intended as equivalent to notes, ■accounts, and other evidences of indebtedness, and to require the gross amount of all these evidences to be taxed. On the other ■hand, I insist it was never intended to tax them, as such, at all, and that the word is susceptible of no such meaning. I feel prepared to defend not only the spirit and object of the provision, but ■also its literature. It neither violates justice nor standard English, .if the best lexicographers may be relied upon for the definition of the words. Webster says this word, used in the plural, signifies “ a sum of money due to any person; anything valuable standing ■on the creditor side of an account.”
We are constantly to keep in mind, as I have already said in .respect to the notes against an insolvent maker, and as is admitted, that the true value in money of the credit is only to be taxed. Now, if there is no balance, assuredly there can be no “ sum of money due,” however large the items upon each side of the account may 60] be. And is it not equally clear that *the items upon the credit side are of no value so far as they are balanced by the debts upon ■the other side? If the account existed between two merchants, I ■think it would not be difficult for them to understand it so. But the account is to be stated between the individual and the state. To ascertain the wealth he has beyond his property in possession, *61 the state charges him with the debts due to him, and credits him with those he owes. If the balance is in his favor, it is authorized and required to tax him upon this balance. And why? Simjfiy because there is the exact sum of money due to him as against all others, and he is just as much richer as it amounts to.
But suppose this is doubtful. What more obvious method to ascertain the sense in which the word was used than to place ourselves in the situation of those who used it, and look at things exactly as they saw them. To -consider the “ occasion and necessity of the law ” — whether a mischief was felt, and if so, what remedy was intended to be provided — not to be governed by what this or that man might have said, but what was' the received and general contemporaneous construction put upon the language employed by those who used it, and others, at the time. This is not prohibited. On the contrary, it has passed into a maxim that contemporania ex-positio est fortissimo in lege.
If we are permitted to look at things as they were seen, and understand them as they were understood, we shall find that no fault was found with the established system in this particular, no mischief was felt, and no remedy proposed. On the contrary, it was upon all hands received as an established fact, that it was authorized, and would continue if the constitution was adopted.
Notwithstanding what I have said of the meaning of the word “ credits,” I must confess a disinclination to indulge in any mere verbal criticisms upon so grave a subject. Language, at best, is but an imperfect vehicle of thought, and when used with the sententious brevity required in enunciating a great principle in a constitutional provision, intended *to govern future cases, it can [61 not be made so certain and explicit as not to admit of doubt as to its interpretation, unless those who perform this office, looking through the mere forms of expression, are able to embody and distinctly comprehend the great leading idea which governed in its use. In no other way can the intention, which must always prevail, be arrived at. Nor is this in the least departing from the path of judicial duty. Lord Erskine but reiterates the universal sentiment of courts and jurists, under every system of law which has ever risen to the dignity of a science, when he says: “ Where the strict letter of the law is contrary to its spirit, or to equity, judges ought not so much to regard the proper or received signification of the words as that meaning which appears most consonant to the *62 design of the law. And he bids fairest for a just interpretation who keeps constantly in view the mischiefs or defects which existed in the former laws on the same subject, the remedies which the statute has provided to cure them, how far those remedies are proper, and what sense appears the most consonant to the subject-matter, and most agreeable to equity.” With this end in view, and and as the third section, it seems to me, demonstrates what was intended by the second, and must therefore be construed with it, I proceed to its consideration: “ The general assembly shall provide by law for taxing the notes and bills discounted or purchased, moneys loaned, and all other property, effects, or dues of every description (without deduction), of all banks now existing, or hereafter created, and of all bankers, so that all property employed in banking shall always bear a burden of taxation equal to that imposed on the property of individuals.”
Does this section mean anything ? An established rule of construction compels us to suppose it was intended to mean something. Utter folly can not, in the fii-st instance, be imputed to those who placed it among the fundamental laws of the state. However poor our recollections, we can not forget that it was supposed to mean 62] something, by both its *friends and foes in and out of the convention. And yet, if the construction of the second .section contended for, is correct, I think it clear, it is pure surplusage, and entirely unmeaning.
What effect can it have ? Did it intend to assert that all banks “ now existing or hereafter created,” should be taxed upon all their property? That was already done by the fourth section of the corporation article. Did it intend to require all notes, other choses ■in action, and property of every kind belonging to banks, to be taxed without deduction for liabilities ? That, we are told, is exactly what is positively and plainly required by the second section. Did it intend to subject their property to the same burden of taxation as that of individuals ? If taxed upon exactly the same basis, neither being allowed deductions, and “ by a uniform rule,” it could result in nothing else. Did it intend to deny to banks the same exemption permitted to be allowed to individuals by the second section ? This could not be, because deductions and exemptions are two separate and distinct things, having no connection; and, because, by the second section, the exemption could only be allowed to “ individuals,” ‘and not to a corporation of any kind. Be- *63 *,ides, to suppose this was made the subject of a separate constitu úional provision, would certainly indicate a return of the “ day of small things.”
I can not regard this section as either useless or unmeaning. In my judgment, it is pregnant with meaning throughout. In the first place it prescribes definitely what property belonging to banks shall constitute the basis of taxation. This is, in short, all choses in action, and all other property. It is certainly remarkable, that the same mind intending to effect the same object, should have used the term credits in the second section, and should have changed the phraseology to notes, bills, etc., in the third; and it is still more remarkable, if no deductions were to be made from choses in action on account of liabilities, by the second section, that it should have been expressly interdicted by the third. This ^change of ex- [63 pression certainly indicates a purpose, a distinction, and not that both sections were to be construed to mean exactly the same thing. I am well convinced a distinction was intended; a distinction found in the subject-matter to which each relates, and necessary 'to the ends of justice; a distinction, not destructive of equality of burdens as between banks and individuals, but necessary to preserve it; a distinction which makes the third section indispensable, and without which the constitution would have been unjust. This distinction consists in allowing individuals to deduct from the debts due to them, the debts they may owe, and denies the right to do so to the banks. But it is asked, why should this be done ? This question was many times asked and answered in the convention that framed the constitution, and while it was pending before the people for ratification. The objectors never denied that this difference obtained, but insisted that it was inconsistent with the equality professed, and therefore unjust. The answer given, and upon which a majority approved the instrument, I believe to have been sufficient, and adopt it now. The only necessary liabilities of a bank consist of its circulation. This it has a right, at all times, to maintain up to a certain amount. Although in strictness, it consists of mere promissory notes, yet, in effect, it is an exclusive privilege to create a circulating medium, and for all practical purposes to give it the character of money. It is loaned as money without paying interest upon it; and the obligation of the borrower taken upon interest. In effect, it is never payable during the continuation of the bank; for, if redeemed, it is immediately reissued, and the *64 amount outstanding is left as large as before. In fact, the bank itself, indirectly, receives, instead of paying interest upon its own indebtedness, which, by law, usage, and necessity combined, has, so far as profit and gain to the bank are concerned, all the attributes, uses, and beneficial enjoyment of money, and constitutes a source of wealth to its stockholders instead of a burden upon them. Upon the other hand, the indebtedness of individuals has nothing of this 64] ^character. It is payable at a certain time; almost always upon interest, often at a high rate, and is, to all intents and purposes, a burden, a source of impoverishment to him who has it to pay.
Is it strange that the constitution did not subject things so entirely dissimilar in their nature, to the same rule.? Is it strange, while the bankers considered, used, and enjoyed their circulation as money, and a source of wealth and profit, and the law so far considered it so, as to allow it tó be used as a tender in payment of debts, unless objected to at the time, and to be levied, upon execution, as property having intrinsic value, that the convention did not ignore all this when taxes were to be levied ? In short, is it strange, while the government lightens its hand to relieve a burdened class, that it did not at the same time, in the same manner and to the same extent, relieve from taxes a benefited class, to whom it had almost surrendered, in the way of special privilege, the government prerogative of coining money. I think it would have been “passing strange ” if it had; and would have destroyed that equality of burden between the two classes of persons, which I admit it was the greatest object of the constitution to effect.
This construction gives effect, and I think a just effect, to all the provisions of the constitution, to every sentence and word in it; while the opposite renders nugatory, useless, and unmeaning, the whole of the third section of the twelfth article; and to my understanding, perverts, from the natural and intended meaning, much of the language of the second section. It shows the necessity of the third section to prevent banks from deducting their liabilities for their circulation from the debts duo to them; and by the strongest possible implication, demonstrates that they would have been entitled to this deduction, in common with others, under the second section.
I have said the only necessary liabilities of a bank consist in its circulating notes. I do not say this in ignorance of the fact that it *65, 66 is authorized, at its election, to receive ^deposits and deal in [65 exchange. But it is perfectly evident that the tax upon money received upon deposit, and used by the bank, is no charge whatever upon it. Its market value for this purpose will be regulated with reference to the charge upon it; and of course less interest will be paid for its use than if no such charge existed; and only enough will be paid for its use to still leave the customary profit to the institution. If any one is injured it is the depositor, whose money is thus made less valuable in the market for this purpose.
But it is said the constitution proclaims equality of burdens in taxation as its great cardinal principle. I admit it; and assert that it also means equality, a-nd has adopted the very plan that secures it. What is really wealth it calls wealth, and taxes it accordingly. What is really a burden, a source of impoverishment, it calls so, and treats it accordingly. The paper money issued by banks, under authority of law, and represented in their notes and bills discounted, is lent as money, borrowed as money, and the interest paid for its use as money. It buys lands and goods, and everything valuable, and therefore the constitution treats it, as those who issue it treat it, as so much wealth, impresses upon it the character of property, and refuses to allow deductions on account of it. Exactly the reverse arising from individual indebtedness, a different rule is applied, and deductions on account of it, from debts due to the individual, areal-lowed. This is no arbitrary distinction. It has its foundation in the essential character and attributes of the subject-matter to which it applies ; and results, as I firmly believe, in charging upon property employed in banking a burden of taxation only equal to that imposed on the property of individuals.
The construction adopted by a majority of the court will undoubtedly result in swelling very largely the taxable basis of the state; one of the counsel supposed one hundred millions of dollars. I should not be surprised if it should come *to one-half that [66 amount. This will, to some extent, reduce the taxes of these institutions, as well as those of tax-payers who are not indebted. This would be matter of congratulation were it not for the fact that every dollar taken from their shoulders must be placed upon those less able to bear it, and levied substantially upon persons instead of property. I especially fear its effects upon a large class of enterprising merchants and manufacturers, whose course of business compels them to purchase their stock, to a great extent, upon credit, *67 and to extend a like credit to their customers. I feel very sure that it never could have been intended to lay unusual burdens upon a class of men who had contributed so largely to develop the resources and increase the wealth of the state.
A question has been made as to the jurisdiction of a court of equity in this case, if the tax had been unconstitutionally levied. Without entering upon an examination of this question, I will barely say that if a case was made upon the merits, I should be of opinion that the jurisdiction might be maintained.